UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **TERRY GANTT** | **CIVIL ACTION** |
| **VERSUS** | **No. 18-2569** |
| **SEADRILL AMERICAS, INC., ET AL.** | **SECTION I** |

## ORDER & REASONS

Before the Court is defendants LLOG Bluewater Holdings, LLC ("LLOG Bluewater") and LLOG Exploration Offshore, LLC's ("LLOG Exploration") (collectively, the "LLOG defendants") motion[1] for summary judgment. For the following reasons, the motion is granted.

### I.

This case arises out of injuries plaintiff Terry Gantt ("Gantt") allegedly suffered when responding to a fire that broke out in an air handling unit on board the M/V WEST NEPTUNE (the "vessel") in March 2015.[2] Because the complaint does not specify which claims pertain to which defendants, the LLOG defendants' motion addresses all of the claims for relief listed in the complaint. In his opposition, Gantt clarified that he is only pursuing general maritime negligence claims against the LLOG defendants.[3] Therefore, the Court will not consider the LLOG defendants' arguments as to Gantt's Jones Act negligence and unseaworthiness claims.[4]

---

[1] R. Doc. No. 37.
[2] *See* R. Doc. No. 44, at 1.
[3] *Id.* at 9 n.12.
[4] The LLOG defendants assert that LLOG Exploration was not involved in the operations being performed on the vessel and that it is, therefore, an improper

On the date of the March 2015 fire, Gantt was working aboard the vessel as an assistant crane operator employed by defendant Seadrill Americas, Inc. ("Seadrill Americas").[5] According to Gantt's account of the subject incident, the air handling unit's filter material came into contact with the unit's heater elements, resulting in a fire because there was no physical barrier preventing such contact.[6] Gantt alleges that he was one of the crew members who responded to the fire.[7]

The LLOG defendants state that the vessel was operating on a federal oil and gas lease block as a result of a contract (the "daywork drilling contract") between LLOG Bluewater, the leaseholder, and Seadrill Deepwater Contracting, Ltd. ("Seadrill Deepwater"), the drilling contractor.[8] Pursuant to the daywork drilling contract, Seadrill Deepwater—which is not a party to this lawsuit—was to furnish the vessel, as well as the drilling equipment, insurance, and personnel.[9] It is uncontested that the LLOG defendants had no ownership interest in the vessel.[10] Rather, the vessel was owned by Seadrill Neptune Hungary Kft. ("Seadrill

---

defendant. R. Doc. No. 37-2, at 2 n.5. However, apart from this motion for summary judgment, the LLOG defendants have not moved for LLOG Exploration's dismissal.
[5] *Id.*; R. Doc. No. 37-2, at 2.
[6] R. Doc. No. 44, at 1.
[7] *Id.*
[8] R. Doc. No. 37-2, at 2; R. Doc. No. 37-8, at 1. Seadrill Deepwater eventually assigned the daywork drilling contract to another Seadrill entity, Seadrill Gulf Operations Neptune, LLC. R. Doc. No. 37-8, at 57; R. Doc. No. 37-3, at 2. However, because other contracts that are relevant to resolving the present motion refer to Seadrill Deepwater as the contractor with respect to the daywork drilling contract, the Court will use "Seadrill Deepwater" herein to refer to the contractor.
[9] R. Doc. No. 37-8, at 1.
[10] R. Doc. No. 37-1, at 2; R. Doc. No. 44-6, at 1.

Neptune").[11] Gantt alleges that the LLOG defendants, as the leaseholder party to the daywork drilling contract, "held all rights and obligations."[12] He seeks to hold the LLOG defendants liable under a theory of general maritime negligence.[13]

## II.

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, the Court determines that there is no genuine dispute of material fact. *See* Fed. R. Civ. P. 56. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of a material fact; it need only point out the absence of evidence supporting the other party's case. *Id.*; *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

---

[11] R. Doc. No. 37-2, at 2; *see also* R. Doc. No. 44, at 8–9. This Seadrill entity is distinct from the Seadrill Neptune entity discussed in footnote 8. In a November 28, 2018 telephone conference, counsel for all parties explained that Seadrill Neptune, Seadrill Deepwater, and Seadrill Americas are separate entities. Confusingly, the parties have yet to explain the relationship between Seadrill Deepwater, which was required to furnish the vessel under the contract, and Seadrill Neptune, which owned the vessel.
[12] R. Doc. No. 44, at 1.
[13] *Id.* at 9 n.12.

574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted).

Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . , the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., LLC*, 859 F.3d 353, 355 (5th Cir. 2017) (citations omitted). The party responding to the motion for summary judgment may not rest upon the pleadings but must identify specific facts that establish a genuine issue. *Anderson*, 477 U.S. at 248. The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; *see also Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

**III.**

"General principles of negligence guide the analysis of a maritime tort case." *Casaceli v. Martech Int'l, Inc.*, 774 F.2d 1322, 1328 (5th Cir. 1985). Accordingly, "[t]o establish maritime negligence, a plaintiff must demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's

4

injury." *Skinner v. Schlumberger Tech. Corp.*, 655 F. App'x 188, 192 (5th Cir. 2016) (quoting *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000)). The LLOG defendants argue that Gantt's claims fail because Gantt cannot prove that they owed him a duty—one of the critical elements of such a negligence claim.[14]

The Fifth Circuit has "consistently held that a principal who hires independent contractors over which he exercises no operational control has no duty to discover and remedy the hazards created by its independent contractors."[15] *Skinner*, 655 F. App'x at 192 (quoting *Wilkins v. P.M.B. Sys. Eng'g, Inc.*, 741 F.2d 795, 800 (5th Cir. 1984)). According to the daywork drilling contract, LLOG Bluewater hired Seadrill Deepwater as an independent contractor.[16] Seadrill Deepwater was obligated to carry out the offshore drilling operations, which included furnishing the vessel that included the allegedly defective air handling unit.[17] Critically, Gantt concedes that the LLOG defendants did not exercise operational control.[18] Instead, Gantt argues that the LLOG defendants owed him a duty under two different theories, which the Court will consider in turn.

---

[14] R. Doc. No. 37-2, at 5.
[15] "An exception to this general rule occurs 'where the principal [ ], despite the independent contractor arrangement, actually retained some degree of control over the manner or methods by which the contractor [ ] does his work." *Skinner*, 665 F. App'x at 192 (quoting *Wilkins*, 741 F.2d at 800). Gantt has not argued that this exception applies.
[16] R. Doc. No. 37-8, at 3.
[17] *Id.* at 1, 2.
[18] R. Doc. No. 37-1, at 2; R. Doc. No. 44-6, at 1.

5

## A.

Gantt first argues that the LLOG defendants owed him a duty to ensure that the vessel's equipment and work areas were in a safe condition pursuant to 30 C.F.R. § 250.107.[19] Section 250.107 was promulgated pursuant to the Outer Continental Shelf Lands Act ("OCSLA"). The regulation provides that certain leaseholders, including the LLOG defendants in this case, must "[m]aintain[ ] all equipment and work areas in a safe condition." 30 C.F.R. § 250.107(1)(2); *see also Voces v. Energy Res. Tech., G.O.M., L.L.C.*, 704 F. App'x 345, 348 n.4 (5th Cir. 2017) (noting that 30 C.F.R. § 250.107 applies to "a lessee or its designated operator under an offshore mineral lease").

Gantt alleges that one of LLOG's company men, Michael Harris ("Harris"), inspected the vessel numerous times in 2014 while it was still in its original construction yard in South Korea.[20] The vessel was constructed at approximately the same time and in the same place as its sister vessel, the M/V WEST SATURN (the "WEST SATURN").[21] Gantt claims that in 2014, during the time that Harris was in South Korea purportedly inspecting the WEST NEPTUNE, a fire broke out on the

---

[19] *See* R. Doc. No. 44, at 8. Gantt incorrectly cites 28 U.S.C. § 250.107, which does not exist. *Id.* Moreover, as the LLOG defendants note, the version of 30 C.F.R. § 250.107 that Gantt quotes was not in effect in March 2015. *See* Oil and Gas and Sulfur Operations in the Outer Continental Shelf-Blowout Preventer Systems and Well Control, 81 Fed. Reg. 25,888, 26,014 (Apr. 29, 2016). However, the text of the pertinent subsections was part of the version in effect at the time, so the Court's analysis is the same.
[20] R. Doc. No. 44, at 4, 6.
[21] *Id.* at 4; *see also* R. Doc. No. 44-6, at 2; R. Doc. No. 53-1, at 1.

6

WEST SATURN.²² Gantt alleges that the WEST SATURN fire was similar to the fire that eventually broke out on the WEST NEPTUNE in March 2015.²³

According to Gantt, Harris knew about the WEST SATURN fire, but he did not seek information about it—despite the fact that he "must have known" that the WEST SATURN and the WEST NEPTUNE were sister vessels.²⁴ Gantt argues that Harris, and hence the LLOG defendants, violated a duty they owed him pursuant to 30 C.F.R. § 250.107 by failing to "rectify" what he characterizes as a "known fire hazard" in one of the WEST NEPTUNE's air handling units.²⁵

The LLOG defendants argue in response that, even if they violated § 250.107, the Fifth Circuit has rejected the argument that OCSLA regulations give rise to a private cause of action or create a legal duty.²⁶ They rely primarily on *Fruge v. Parker Drilling Co.*, 337 F.3d 558 (5th Cir. 2003), in which the Fifth Circuit held that a violation of OCSLA regulations does not create a private cause of action. *Id.* at 563. The *Fruge* court also concluded that the regulations do not create an independent duty under Louisiana law. *See Fruge*, 337 F.3d at 563–64. However, Louisiana law does not govern this case.

Because all of the cases that the LLOG defendants cited in their motion for summary judgment to demonstrate that they did not owe Gantt a duty under 30 C.F.R. § 250.107 are Louisiana negligence cases, while the motion was pending the

---

²² R. Doc. No. 44, at 4.
²³ *Id.* at 4–5.
²⁴ *Id.* at 6.
²⁵ *Id.* at 8.
²⁶ R. Doc. No. 53, at 3.

7

Court ordered the parties to submit additional briefing with respect to the issue of whether OCSLA regulations may nevertheless serve as a basis for a duty under general maritime negligence law.[27]

In its supplemental brief, the LLOG defendants argue that *Fruge*'s holding is not limited to Louisiana negligence claims.[28] They rely exclusively on *Creppel v. Shell Oil Co.*, 738 F.2d 699, 702 (5th Cir. 1984). In *Creppel*, the plaintiff's boat struck a pipe in navigable waters that had been leased to the defendant. *Id.* at 700. Alleging negligence, the plaintiff predicated the defendant's duty "on its status as mineral lessee with notice that the potentially hazardous object was in the water covering a portion of [the defendant's] lease." *Id.* at 700, 701. The Fifth Circuit held that a defendant may only be liable for damages resulting from a collision between a boat and an object in the defendant's waters if the defendant owned, placed, maintained, or controlled the object. *See id.* at 701–02.

Although *Creppel* is most often cited for the foregoing principle, the Fifth Circuit also held that an OCSLA regulation similar to the regulation at issue in this case "does not make lessees insurors of their work areas. . . . A breach of the regulation provides no federal civil cause of action."[29] *Id.* at 702; *see also Tolar v.*

---

[27] R. Doc. No. 58, at 2.
[28] *See* R. Doc. No. 59, at 2.
[29] The regulation discussed in *Creppel* provided, in relevant part, "The lessee shall perform all operations in a safe and workmanlike manner and shall maintain all equipment in a safe condition for the protection of the lease and associated facilities, for the health and safety of all persons, and for the preservation and conservation of property and the environment." *Creppel*, 738 F.2d at 702 (quoting what was, at that time, 30 C.F.R. § 250.46).

8

*McMoran Offshore Prod. Co.*, 706 F. Supp. 472, 476 (W.D. La. 1987) (applying *Creppel* to a Texas strict liability lawsuit and holding that a breach of OCSLA regulations does not "create[ ] a private right of action for lessee violations").

What the LLOG defendants fail to mention is that, like *Fruge* and the other cases cited in the motion for summary judgment, *Creppel* involved a negligence action under Louisiana law. *See Creppel*, 738 F.2d at 700 (explaining that the plaintiff sued the defendant "alleging admiralty as well as diversity jurisdiction over a Louisiana strict liability cause of action"). However, the Court nonetheless finds support for the LLOG defendants' position in *Creppel* because, in addition to finding that OCSLA regulations do not create a private cause of action, the Fifth Circuit explained that "the[ ] regulations are in no way 'analogous to safety regulations which require a specific standard of conduct in particular situations,' and establish no special standard of care in a negligence action." *Id.* at 702 (quoting *Bourg v. Texaco Oil Co., Inc.*, 578 F.2d 1117, 1120 (5th Cir. 1978)).

The *Creppel* Court reiterated its holding, finding "no basis in *federal regulations or applicable federal maritime law* to impose upon a mineral lessee a duty to police the waters covered by its lease or to take steps to remove obstructions which it does not own, has not placed there, or does not maintain or control." *Id.* (emphasis added). *Creppel*'s reasoning is not unique to Louisiana negligence law. Gantt has not offered any reason why *Fruge* and *Creppel* should not apply by analogy to this case.

The reasoning in *Creppel* comports with *Bourg*, in which the Fifth Circuit explained that interpreting the relevant OCSLA regulations to impose a duty under

9

Louisiana law would be erroneous, "absent a clear indication from Congress that this was their intent." *Bourg*, 578 F.2d at 1121. A review of OCSLA's legislative history "uncover[ed] no such intent." *Id.* at 1121–22. Extrapolating from *Bourg*, the Court notes that neither has Congress provided a clear indication that OCSLA regulations are intended to create a duty under general maritime law. Nor is there any case suggesting that 30 C.F.R. § 250.107 establishes a "special standard of care" in general maritime negligence cases. *See Creppel*, 738 F.2d at 702.[30]

Although the Fifth Circuit has not directly addressed the issue of whether OCSLA regulations impose a duty on offshore drilling leaseholders in general maritime negligence cases, the Court concludes that *Creppel*, *Fruge*, and their progeny are applicable. Accordingly, the directives set forth in 30 C.F.R. § 250.107 cannot serve as the basis for establishing that the LLOG defendants owed Gantt a legal duty. *Cf. Tajonera*, 2015 WL 6758258, at *17 ("Without guidance from the Fifth Circuit . . . finding that the federal regulations create[ ] a private cause of action, the Court declines to find that they imposed a statutory duty . . . that may be enforced in this Court by the . . . Plaintiffs.").

---

[30] In his supplemental brief, Gantt admits that there are no cases holding that OCSLA regulations provide a cause of action under general maritime law. R. Doc. No. 60, at 1. Rather, he relies on *Bourg* to argue that evidence of a breach of federal safety regulations may be admissible at trial to prove that the defendant owed the plaintiff a duty. *Id.* However, as the Fifth Circuit has explained since *Bourg*, this evidentiary rule is specific to Louisiana law and may help demonstrate a defendant's negligence, not establish a duty: "While there is no implied cause of action from the mere breach of . . . regulations, Louisiana law does recognize that applicable federal regulations may be relevant evidence in weighing a defendant's culpability." *Romero v. Mobil Expl. & Producing N. Am., Inc.*, 939 F.2d 307, 311 (5th Cir. 1991)

**B.**

Gantt next argues that a certain agreement between LLOG Bluewater and Seadrill Deepwater demonstrates that the LLOG defendants owed him a duty. 30 C.F.R. § 250.1900 provides that leaseholders "must develop, implement, and maintain a safety and environmental management system (SEMS) program." Pursuant to § 250.1900, LLOG Bluewater and Seadrill Deepwater signed a contract (the "bridging agreement") that "specifies the expectations regarding safety and environmental management between the Operator's SEMs and the Contractor's safety and environmental policies and practices."[31] The operator is listed in the bridging agreement as "LLOG," and the contractor is Seadrill Deepwater.[32]

The bridging agreement contains a table "indicat[ing] whether the LLOG or [Seadrill Deepwater] manuals, policies, responsibilities, and procedures prevail during the term of [the] agreement."[33] In the table, an "X" is placed under LLOG's name for the description "LLOG and 3rd party owned equipment is fit for purpose and meets regulatory standards."[34] The accompanying comment provides in relevant part, "LLOG will confirm fit for purpose through shore base [sic] screening and 3rd party contractor communications."[35]

---

[31] R. Doc. No. 53, at 5.; R. Doc. No. 44-8, at 1.
[32] R. Doc. No. 44-8, at 1.
[33] *Id.*
[34] *Id.* at 4. The bridging agreement states that an "X" placed under either "LLOG" or Seadrill Deepwater's name "indicates responsibility for the particular item and/or Safe Work Practice." *Id.* at 2.
[35] *Id.* at 4.

11

Gantt argues that this item in the table establishes that the LLOG defendants were required to confirm that all third-party owned equipment was fit for its purpose.[36] Gantt contends that the air handling unit must constitute third-party owned equipment as it was owned by Seadrill Neptune, which is not a party to the bridging agreement.[37] Thus, according to Gantt, the LLOG defendants had a duty to screen the air handling unit on the vessel to ensure that it was fit for its purpose, and they failed to do so.[38]

The LLOG defendants reurge their argument that SEMS-related regulations do not create a private cause of action or a legal duty under Fifth Circuit jurisprudence.[39] However, there is a distinction between the regulations themselves and contracts created as a result of obligations arising out of such regulations. The critical question is whether the language that Gantt cites from the bridging agreement (noting that "LLOG will confirm" that third-party owned equipment is "fit for [its] purpose") is evidence of a separate, relevant duty that the LLOG defendants owed to Gantt.

The LLOG defendants argue that there is nothing in the record to support Gantt's argument that they violated the terms of the bridging agreement or that the air handling unit was third-party owned equipment as contemplated by the agreement.[40] In support of this argument, the LLOG defendants submitted two

---

[36] R. Doc. No. 44, at 8.
[37] *Id.*
[38] *Id.*
[39] R. Doc. No. 53, at 5.
[40] *Id.* at 5 n.18.

12

declarations—one from each party to the bridging agreement. The first declaration is from LLOG Exploration Company, L.L.C.'s general counsel, George Gilly ("Gilly").[41] Gilly attests that "[t]his provision pertains, not to appurtenances of the drill ship or equipment owned by Seadrill [Neptune] or any of its affiliated entities, but to equipment owned and brought on board the WEST NEPTUNE by vendors with which LLOG contracts directly to provide exploration and production services, such as wireline, completion and cementing, for its wells."[42]

Gilly states that Gantt's interpretation of the bridging agreement is not only incorrect, but that it is "inconsistent with the [agreement's] plain intent."[43] According to Gilly, "Gantt's proposed interpretation would mean that LLOG agreed to be responsible for insuring that the WEST NEPTUNE and all of its appurtenances were fit for their intended purposes and met all regulatory requirements."[44] However, Gilly and the LLOG defendants are adamant that "LLOG . . . made no such undertaking."[45]

The second declaration is from Jon Olav Osthus ("Osthus"), director of Seadrill Deepwater. Osthus states that he "concur[s] with [Gilly's] interpretation" of the bridging agreement.[46] "The WEST NEPTUNE's No. 2 air handling unit and its

---

[41] R. Doc. No. 59-1. Gilly states that, as vice president and general counsel of LLOG Exploration Company, L.L.C., he is "personally familiar with contracts entered into by [the company's] affiliates," including the LLOG defendants. *Id.* at 1.
[42] *Id.* at 2; R. Doc. No. 59, at 4.
[43] R. Doc. No. 59-1, at 2.
[44] *Id.* at 2–3.
[45] *Id.* at 3.
[46] R. Doc. No. 63, at 2. The LLOG defendants initially submitted only Gilly's declaration. On December 20, 2018, the Court held a status conference to discuss the arguments surrounding the parties' interpretation of the bridging agreement. *See* R. Doc. No. 62. Counsel for the LLOG defendants explained that both parties to the

13

component parts . . . are not '3rd party equipment' as contemplated by the [bridging agreement], and it was not the intent of the parties to the [daywork drilling contract] to make LLOG responsible for insuring that the WEST NEPTUNE, including her No. 2 air handling unit and its component parts, were fit for their intended purposes and met regulatory requirements."[47]

The LLOG defendants further argue that nothing in the bridging agreement indicates that it was intended to supersede any other agreements between the contracting parties.[48] The bridging agreement says as much: "This Agreement does not supersede the requirements of any applicable regulations or any other Service Agreements between the Operator and the Contractor."[49] It also provides that the agreement was "entered into by the parties for clarification purpose only and it [was] not intended to modify any of LLOG's or Seadrill [Deepwater's] rights, obligations, and liabilities under the original contract."[50] Considering that the contract provides that Seadrill Deepwater is "obliged to assume the defense and indemnity of LLOG for claims of the type asserted by [Gantt]," the LLOG defendants argue that Gantt's interpretation of the bridging agreement "flies in the [face] of the parties' obvious intent."[51]

---

bridging agreement agree on how "third party equipment" should be interpreted. Consequently, the Court requested an affidavit from an appropriate representative of Seadrill Deepwater.
[47] *Id.* at 2–3.
[48] R. Doc. No. 53, at 5 n.18.
[49] R. Doc. No. 44-8, at 1.
[50] *Id.* at 9.
[51] R. Doc. No. 59, at 3; *see also* R. Doc. No. 37-8, at 24–28 (Article 9 of the daywork drilling contract).

14

The Court need not interpret the indemnity provision of the daywork drilling contract. The bridging agreement was entered into between two sophisticated parties, both of whom attest that "third party equipment" as it is used in the agreement did not include the vessel's air handling unit. Although Gantt says otherwise, he was not a party to the bridging agreement, and he has not pointed to any evidence in the record that directly contradicts the declarations provided as evidence by the LLOG defendants.

Gilly and Osthus's interpretation of third-party owned equipment is supported by additional provisions of the daywork drilling contract and the bridging agreement. Describing what is required of Seadrill Deepwater, the daywork drilling contract states that "all materials, equipment, goods, supplies or manufactured articles *furnished by* Contractor in the performance of the work or services shall be suitable quality and workmanship for their intended purposes."[52] The daywork drilling contract explicitly states that Seadrill Deepwater was obligated to furnish the vessel.[53] In fact, the bridging agreement indicates that Seadrill Deepwater was the entity responsible for a "rig hazards analysis," and an "X" is placed under Seadrill Deepwater's name alongside the item "OIM responsible for vessel safety."[54] According to the contract, "OIM" refers to the offshore installation manager, who the contract includes in a list of personnel to be provided by Seadrill Deepwater.[55]

---

[52] *Id.* at 8.
[53] *Id.* at 1.
[54] *See* R. Doc. No. 44-8, at 2, 4.
[55] R. Doc. No. 37-8, at 10; R. Doc. No. 37-8, at 39.

The evidence demonstrates that the LLOG defendants did not take on an additional duty to ensure the safety of the vessel or its appurtenances through the bridging agreement.[56] The Court concludes that Gantt's unsupported assertion that the air handling unit constitutes third-party owned equipment, as contemplated by bridging agreement, does not create a genuine dispute as to the existence of a duty that the LLOG defendants owed to Gantt. Accordingly, the LLOG defendants are entitled to summary judgment as a matter of law.

IV.

For the foregoing reasons,

**IT IS ORDERED** that LLOG Bluewater Holdings, LLC and LLOG Exploration Offshore, LLC's motion for summary judgment is **GRANTED** and that Terry Gantt's claims against LLOG Bluewater Holdings, LLC and LLOG Exploration Offshore, LLC are **DISMISSED WITH PREJUDICE.**

New Orleans, Louisiana, December 21, 2018.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

---

[56] By entering into the bridging agreement, the LLOG defendants owed certain duties to Seadrill Deepwater, the other party to the contract. Gantt has not explained how those duties would extend to him.